UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

CIVIL ACTION NO. 06-100-HRW

JOHNNY JOHNSON                                                        PLAINTIFF

VS:              **<u>MEMORANDUM OPINION AND ORDER</u>**

JOHN D. REES, ET AL.                                          DEFENDANTS

The plaintiff, Johnny Johnson ("Johnson"), is an inmate confined at the Little Sandy Correctional Center ("L.S.C.C.") in Sandy Hook, Kentucky. Proceeding *pro se*, he has filed a complaint pursuant to 42 U.S.C. §1983 [Record No. 1]. He has also filed a motion to proceed *in forma pauperis* [Record No. 2], which has been addressed by separate Order.

The Court screens civil rights complaints pursuant to 28 U.S.C. §1915A. *McGore v. Wrigglesworth*, 114 F.3d 601, 607-08 (6th Cir. 1997). This is a *pro se* complaint and, as such, it is held to less stringent standards than those drafted by attorneys. *See Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972). The allegations in a *pro se* complaint must be taken as true and construed in favor of the plaintiff. *See Malone v. Colyer*, 710 F.2d 258, 260 (6th Cir. 1983). However, 28 U.S.C. §1915(e)(2) affords a court the authority to dismiss a case at any time if the court determines the action: (i) is frivolous or malicious, or (ii) fails to state a claim upon which relief can be granted.

## BACKGROUND

In his complaint, Johnson alleges that he is a Jehovah's Witness and that a central part of his religious faith requires him to "witness" and to distribute religious literature to others. Johnson complains that while the defendants at L.S.C.C. have permitted outside organizations, including the

Jehovah's Witnesses, to donate religious literature to the prison's chapel where other inmates are free to take extra copies, they have refused to permit him to take that literature and to distribute it to other inmates directly. Johnson has attached the prison's responses to his grievances on this issue, and L.S.C.C.'s responses indicate that Johnson is free to discuss his religious views with other inmates, advise other inmates that this religious literature is available in the chapel library, and recommend to other inmates that they review or take these extra copies for their personal use. Johnson is simply prohibited from taking that religious literature from the chapel library and directly handing it to other prisoners. L.S.C.C. explains that when an outside individual or religious organization donates these legal materials to L.S.C.C., the materials become the property of the prison, not of any particular inmate to treat as his own.

Johnson asserts that this prohibition violates his rights under the Free Exercise Clause of the First Amendment to the Constitution of the United States. The plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## DISCUSSION

While the constitutional rights possessed by inmates are "more limited in scope than the constitutional rights held by the individuals in society at large," *Shaw v. Murphy*, 532 U.S. 223, 229 (2001), it is well-established that citizens who are convicted of crimes "do not forfeit all constitutional protections by reason of their convictions and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Specifically, inmates retain their rights under the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 822 (1974), which prevents the government from prohibiting the free exercise of religion, *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam).

But the scope of a prisoner's right to freely exercise his or her religious beliefs lies at the crossroads between competing interests: the right of a prisoner to maintain his or her faith through continued practice and the legitimate interest of prison officials in maintaining order and security in a difficult institutional environment. Determining where to draw the balance between these interests, the Supreme Court of the United States long ago concluded that prison officials may place restrictions upon an inmate's practice of his or her religious beliefs so long as an inmate retains a reasonable opportunity to exercise that faith. *Cruz*, 405 U.S. at 322. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court clarified that any prison regulation which directly or indirectly inhibits an inmate's ability to practice his or her religion is nonetheless permissible if it is "reasonably related to legitimate penological interests." *Id.* at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (upholding regulation which effectively prevented Muslim prisoners from attending *Jumu'ah*, a weekly congregational meeting commanded by the Koran). Thus, "[t]he 'free' exercise of religion thus is rather a misnomer in the prison setting." *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988).

Johnson's claim arising directly under the First Amendment must be reviewed under the test articulated by the Supreme Court in *Turner*. But Congress, too, has had its say on what the States may or may not do if they burden a prisoner's ability to act on his or her faith. After the Supreme Court invalidated the Religious Freedom Restoration Act, 42 U.S.C. §§2000bb--2000bb-4, as it applied to state and local governments in *City of Boerne v. Flores*, 521 U.S. 507 (1997), Congress amended the statute in 2000 with the passage of the Religious Land Use and Incarcerated Persons Act, 42 U.S.C. §§2000cc-2000cc-4 ("RLUIPA"). Under the RLUIPA, an inmate must demonstrate that his right to freely exercise his religious beliefs has been "substantially burdened." *Kikumura*

*v. Hurley*, 242 F.3d 950, 960-61 (10th Cir. 2001). If he can make that showing, then the burden of proof shifts to the government to demonstrate that it has a "compelling interest" that justifies imposing the burden, and that no less-restrictive rule would adequately protect that interest. *Flagner v. Wilkinson*, 241 F.3d 475, 481- 482 (6th Cir 2001). While Johnson has not explicitly indicated that he wishes to assert a claim under RLUIPA, it is plainly applicable to his factual allegations. Because the Court must liberally construe his complaint, *Haines v. Kerner*, 404 U.S. 519, 521 (1972), the Court must determine whether Johnson's factual allegations would support a claim under the RLUIPA. The Court will consider the viability of each claim in turn.

1. **First Amendment Claim under the Free Exercise Clause.**

Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The *Turner* court considered four factors to determine whether the conduct of the prison officials involved in that case had satisfied this requirement, while noting that assessing the same four factors might not necessarily be as helpful in different factual circumstances. The Supreme Court first assessed whether the prison officials had demonstrated "a 'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). This factor will favor upholding the challenged regulation if it is legitimate, neutral, and rationally related to the underlying government objective. *Jones v. Campbell*, 23 Fed.Appx. 458, 462 (6th Cir. 2001) (unpublished disposition). But if the prison official's tendered explanation for the connection between the regulation and the asserted goal is "arbitrary or irrational," then the regulation must necessarily fail even if consideration of the other three factors would otherwise support upholding it. *Turner*, 482

U.S. at 89-90. Therefore, absent a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest put forward to justify it, the regulation is unconstitutional *per se*. *Id*.

In contrast, the three remaining factors are merely considerations that can be balanced and weighed, not absolute requirements. If there is a rational explanation for the regulations' furtherance of a legitimate government interest, the Court may then consider:

- whether, even with the regulation in place, prisoners have other ways of exercising their First Amendment rights;

- whether compelling prison officials to accommodate the prisoner's requested activity will unduly interfere with other valid penological concerns or disturb the allocation of prison resources; and

- whether there are alternative means for prison officials to accommodate the prisoner's requested activity at minimal cost to valid penological interests.

*Id*. at 90-91. While these are factors that may be considered, they need not be considered equally or at all: where different circumstances suggest the consideration of different factors, the court should consider those circumstances most relevant to assessing whether the "reasonable relationship" required by *Turner* is present. *Scott v. Mississippi Department of Corrections*, 961 F.2d 77, 80 (5th Cir. 1992); *Nobles v. Hoffman*, 1993 WL 299333 at *2 (7th Cir. 1993) (unpublished disposition); *Spies v. Voinovich*, 173 F.3d 398, 403-04 (6th Cir. 1999).

*Turner*'s requirement, that a prison rule to bear a rational relationship to a legitimate penological concern, is easily satisfied here. A prison has a valid interest in retaining strict control over the items of personal property that are permitted to be carried by prisoners, particularly into the yard area where inmates commingle. In his letter dated June 8, 2006, Charles E. Williams, the Director of Operations and Activities for the Kentucky Department of Corrections, stated that

"[e]xperience and sound correctional management suggests that exchanges between inmates could threaten the safety of those involved." Particularly in light of the "measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation," *Pell v. Procunier*, 417 U.S. 817, 827 (1974), the Court has little difficulty concluding that L.S.C.C.'s interest in maintaining the orderly operation of its facilities and in ensuring that its resources are appropriated in a fair manner given the limitations on space and human resources, constitute a "'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. The slight limitation on Johnson's proselytizing activities are reasonably related to legitimate penological interests.

The second *Turner* factor requires the Court to determine whether L.S.C.C.'s regulation entirely prevents him from exercising his religious beliefs, or whether there remain other permissible avenues for expression. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977). There is no question, nor does Johnson suggest, that the regulation prevents him from exercising other aspects of his faith as a Jehovah's Witness. He may attend services at the chapel and "witness" to other inmates in the yard. Even with respect to his desire to distribute religious literature, nothing in L.S.C.C.'s prohibition prevents him from distributing literature in the chapel library itself. He may talk with other prisoners about his religious convictions in the yard and then provide them with literature about the Jehovah's Witnesses by bringing them to the prison chapel library at permitted times. The ready availability of alternative ways for Johnson to exercise this essential aspect of his faith strongly supports the reasonableness of the regulation.

The third factor under *Turner* weighs "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources

-6-

generally." *Turner*, 482 U.S. at 89. It takes little imagination to postulate the difficulties that would be imposed upon prison officials by an order directing them to give Johnson, and all others similarly situated, *carte blanche* to carry religious materials into the yard area. Even if the purposes for bringing such materials into the yard were entirely benign, it would require prison personnel to search the materials for contraband or weapons, and to accommodate all other prisoner requests to bring such materials into the yard for ostensibly-religious purposes. *Turner*, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."). The additional security measures required would carry an associated cost to the prison, one both financial and logistical, that weighs heavily against affording such a specialized accommodation. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Turner*, 482 U.S. at 90; *see also Childs v. Duckworth*, 705 F.2d 915, 921 (7th Cir. 1983) ("There is no requirement for the authorities to provide [an inmate] with a podium from which to propagate his individual beliefs."); *Robbins v. Grant*, 1993 WL 55191 (9th Cir. 1993) (unpublished disposition).

Finally, *Turner* invites a reviewing court to evaluate alternative means that could be taken by prison officials to accommodate the prisoner's needs with minimal disruption to penological concerns. *Turner*, 428 U.S. at 90. But prison officials need not provide Johnson with a more controlled arena for his proselytizing nor turn over the chapel pulpit to him: "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at

-7-

90-91. As the Seventh Circuit explained:

> In this connection we are mindful that while freedom to believe is absolute, the exercise of religion is not, *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Reynolds v. United* States, 98 U.S. 145, 25 L.Ed. 244 (1878); *Sharp v. Sigler*, 408 F.2d 966 (8th Cir. 1968); *United States v. Kuch*, 288 F.Supp. 439 (D.D.C. 1968), and that prison officials may legitimately impose certain restrictions on the practice of religion in prison, including the right of association, which would be unconstitutional if imposed outside the prison. (Citations omitted).

*Childs v. Duckworth*, 705 F.2d at 920. Considering all of the *Turner* factors, the Court concludes that Johnson is unable to assert a First Amendment claim under the Free Exercise Clause.

### 2. Claim Under the RLUIPA

The RLUIPA forbids state and local governments that receive federal funding from imposing a "substantial burden" on the exercise of religious belief unless the regulation is the least restrictive means to adequately protect a compelling government interest. 42 U.S.C. §2000cc(a)(1); *Dilaura v. Ann Arbor Charter Twshp.*, 30 Fed.Appx. 501, 507 (6th Cir. 2002); *Flagner v. Wilkinson*, 241 F.3d 475, 481-82 (6th Cir 2001).

When a plaintiff asserts a claim under the RLUIPA, he has the initial burden of demonstrating that his right to freely exercise his religious beliefs has been "substantially burdened." *Kikumura v. Hurley*, 242 F.3d 950, 960-61 (10th Cir. 2001). To satisfy the "substantial burden" requirement, the government regulation "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs; must meaningfully curtail a prisoner's ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion." *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995); *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) ("the religious adherent . . . has the obligation to prove that a governmental [action] . . . prevent[s]

him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.").

The Court concludes that Johnson has failed to satisfy his initial burden of proving that L.S.C.C.'s regulation is a "substantial" burden on his religious belief in the need to distribute such literature to others. L.S.C.C.'s regulation only prevents Johnson from taking Jehovah's Witnesses literature outside the chapel library and giving it directly to inmates--it does not prevent him from distributing it to other prisoners inside the chapel library itself. Such a regulation does not prevent Johnson from engaging in the conduct his faith requires, it only circumscribes the place and time. Such a minimal intrusion fails to constitute a substantial burden on the exercise of his religious beliefs. *See, e.g., Weir v. Nix*, 114 F.3d 817, 821-22 (8th Cir. 1997) (prison's prohibition of personal property in prison yard did not substantially burden inmate's rights under the Free Exercise Clause; he was free to use his Bible in his cell in order to prepare for evangelism and counseling that he sought to do with assistance of his Bible in prison yard); *McLaughlin v. Cunningham*, 344 F.Supp. 816, 817 (W.D. Va. 1972) ("prison officials may lawfully restrict the inmates from sending religious materials out of the prison, from distributing them within, or from carrying them to various parts of the prison."); *Burks-Bey v. Stevenson*, 328 F.Supp.2d 928, 937 (N.D. Ind. 2004) (where inmate was denied opportunity to meet with fellow inmates at chapel services on one occasion, inmate was not "prevent[ed] from uplifting their fallen humanity because he retained the opportunity to speak with them about his religion during other times, so long as he remained in general population.").

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1) Plaintiff's complaint is **DISMISSED WITH PREJUDICE.**

(2) The Court certifies that any appeal would not be taken in good faith. 28 U.S.C. §1915(a)(3); *McGore v. Wrigglesworth*, 114 F.3d 601, 610-11 (6th Cir. 1997); *Kincade v. Sparkman*, 117 F.3d 949 (6th Cir. 1997).

(3) Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the defendants.

This 19th day of July, 2006.

                                                HENRY R. WILHOIT, JR.
                                                SENIOR U. S. DISTRICT JUDGE